Filed 11/16/21  P. v. Fernandez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071837 |
| v. | (Super.Ct.No. RIF1309149) |
| ADRIAN MARIA FERNANDEZ et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County. Ronald L. Taylor, Judge. (Retired judge of the Riverside Super Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed with directions as to Fernandez; affirmed in part as modified and reversed in part with directions as to Martinez.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant, Adrian Fernandez.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant, Enrique Martinez.

1

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Adrian Fernandez owed a substantial amount of money to Sergio Lopez, which he couldn't pay. The money related to narcotics and cash the police had seized from an employee of Fernandez. Eventually, Lopez told Fernandez he would harm his family if he didn't make him whole.

Fernandez sought the help of appellant Enrique Martinez, Martinez's brother, and a third man named Jorge to kill Lopez. Jorge contacted Lopez and lured him from Northern California to Riverside County on the false promise of payment. Lopez and a friend drove to Riverside County, where they followed directions communicated by text and phone. The witness accounts differ on the details, but after Jorge had them relocate several times, Lopez and his friend figured out what was going on and fled in their car. Jorge pursued them in his car, and Martinez and his brother pursued in a second vehicle. All three shot at Lopez and his friend, and the pursuit led to a car crash. Lopez's friend escaped on foot, though he suffered a gunshot wound. Lopez wasn't so lucky; Martinez and his brother grabbed him, put him in their vehicle, and drove off. Fernandez was in the vicinity on a motorcycle during these events. Days later, police found Lopez's body with two gunshot wounds to the head dumped in a remote area. They also found Martinez's vehicle, with Lopez's blood in the back seat, abandoned in San Diego County.

Prosecutors tried Fernandez and Martinez together, and a jury convicted them—partially on the testimony of one of their accomplices—of murder, attempted murder, and kidnapping and found true special circumstances—that the murder was committed by means of lying in wait and by kidnapping—warranting increased punishment.

Appellants challenge the prosecution's reliance on uncorroborated accomplice testimony, certain evidentiary rulings of the trial judge, the sufficiency of the evidence absent the challenged evidence, as well as the trial judge's jury instructions and sentencing decisions. We conclude the accomplice testimony was sufficiently corroborated, there was no evidentiary or instructional error, and substantial evidence supports the verdicts. However, the People concede the matter should be remanded to correct certain sentencing errors, and to allow amendments to the abstracts of judgment, and we agree. We therefore reverse and remand on those limited sentencing issues, but otherwise affirm the judgments.

## I

## FACTS

A. *The Conspiracy*

Adrian Fernandez owned a landscaping business in Washington state, where he also sold illegal drugs, which he obtained from contacts in San Bernardino. In the drug trade, Fernandez worked for Sergio Lopez Fernandez, the murder victim in this case, who was a member of a Mexican cartel. We refer to the victim by the name Lopez.

Martinez and Jorge[1] were low-level drug dealers who lived in Moreno Valley. Martinez worked for Fernandez. Jorge was a salesman at a shoe store in a mall where Martinez worked as a security guard. After they met and became friends, Martinez tried to get Jorge to sell drugs for him. Jorge resisted at first, but eventually arranged for Martinez to sell him methamphetamine on credit. Jorge would use a portion of the drug himself and resell the rest to fund his own habit. Martinez introduced Jorge to Fernandez. Eventually, Fernandez invited Jorge to move into his home, which enmeshed him further in the drug trade.

In June 2013, Fernandez asked another subordinate, Luis, to drive to Washington state and pick up some items. Fernandez's wife, Cecilia, rented a car, and Fernandez gave it to Luis. While Luis was in Washington, the car was loaded with items which Luis was expected to deliver to Fernandez. Luis testified that he was acting on behalf of Fernandez in making the pickup.

While Luis was driving back, but still in Washington, a highway patrol officer stopped him, seized all of the items in the car, and arrested him. The seizure netted about 925 grams of methamphetamine, $17,000 in cash, nine firearms, and over 1000 rounds of ammunition, all of which had been secreted away in the car. The total amount of the loss was around $60,000.

---

[1] We refer to percipient witnesses by their first names to protect their confidentiality.

When he found out about the seizure, Lopez texted Fernandez and suggested he would harm his family if Fernandez didn't repay the $60,000. Either Fernandez or his wife answered the texts claiming Fernandez was in custody and couldn't do anything about the debt. Lopez responded, "Look Mrs. or lady, I don't believe that it's true what my cousin is saying that he is or where he's at. I know because you are not good at lying. The thing is that he pretended like he was detained so I don't go out looking for him. What a shame. I'm a good person but not a fool. No, lady. I'm sorry if I am mistaken, but that's what I believe." "Please make him rethink. Tell him to answer me, please. What he's doing, it's grave. I want him to face me."

On August 3, Lopez sent several texts, including, "He's not answering me. I am calling him" and "I apologize for bothering you, lady . . . I'm ashamed with you. I know I've been bothering you and it's not your fault about what's happening. But I also don't expect you to understand me." Cecilia responded, "Listen to me. You were calling my son on my husband's phone. If you don't want to believe me, then you can come and look for him yourself. . . . As to my family's—my husband's fucking family, I don't care now. . . . I don't give a fuck about you and F your fucking family, and I'm going to give the police all the numbers that I found on this fucking phone because I have kids. . . And I'm tired of being harassed."

In response, Fernandez and his associates came up with a plan to kill Lopez. Much of the direct evidence regarding these incidents comes from Jorge, who was an accomplice of appellants, and from Lopez's friend, Luis Rodriguez, who was in the car

with Lopez when the plan came to fruition. Because Jorge was an accomplice who faced legal jeopardy for the same crimes, his testimony requires some measure of corroboration, so we note his statements explicitly. Though Rodriguez was not an accomplice, and he witnessed these events, he didn't positively identify appellants.

Jorge testified he talked several times with Fernandez, Martinez, and Martinez's brother Rolando to discuss how to carry out the killing. Fernandez said he wanted to act before Lopez tried to follow through with his threats. They agreed "[t]he guy was going to get whacked." According to Jorge, Fernandez told Martinez he would be paid $30,000 or $35,000 if he helped Fernandez with the hit, and Martinez agreed. Jorge said he offered to help. Together they planned to lure Lopez to Riverside County on the promise Fernandez would pay him. When he arrived, Martinez would kill Lopez instead.

B. *The Shootout*

According to Jorge, on the night of August 10, 2013, Fernandez gave him a phone to use when communicating with Lopez. Jorge texted Lopez to say Fernandez was in jail, but that if Lopez came to Moreno Valley, they would pay him. According to Rodriguez, Lopez was already planning to go to Mexico around the same time and had asked Rodriguez to drive him to Tijuana and in return agreed he would let Rodriguez use his green Toyota Camry while he was away.

Jorge texted Lopez on the morning of August 11 to arrange a meeting place. Rodriguez said he and Lopez headed south that morning, and at some point Lopez told him he needed to stop to pick up some money. Rodriguez said someone gave directions

6

to Lopez by text message, and Lopez told him where to go. When Rodriguez got to Riverside County, Lopez had him get off the freeway and drive to a house. After they received another text message, Rodriguez kept driving and stopped at a gas station. Lopez then received a message saying it was going to take a while to get the money, so the two went to a restaurant to get something to eat.

Jorge said he returned to Martinez's house, where the others were waiting, and told them Lopez had arrived in town with another man. Fernandez instructed Jorge to drive to a certain gas station and minimart. Martinez and Rolando drove there in Martinez's black Jeep Cherokee. Jorge had a .22-caliber handgun which Fernandez had given him, Martinez had a nine-millimeter semiautomatic handgun, and Rolando also had a gun. Jorge said he then coordinated the meeting at the minimart.

When Lopez and Rodriguez arrived, Jorge drove over to them, got out of his car (a Charger), and told Lopez the money would be there shortly. Martinez and Rolando parked their Jeep at the gas pumps right behind the other two cars. Jorge said he and Martinez then went into the minimart, while Rolando stayed with the Jeep by the pumps. According to Jorge, while they were inside, Martinez tried to get him to shoot Lopez. "That is your chance. Go ahead. Handle him." Jorge said he didn't want to shoot through the car window because he didn't know which man was Lopez and he didn't want to shoot the wrong one.

Jorge said he called Lopez after coming out of the minimart and told him to drive to a house where the money was located. Rodriguez said he followed Jorge's directions but got lost and ended up in a deserted part of town. Confused, he stopped at a corner and parked. He said Jorge showed up and parked the Charger in front of him, leaving his engine running. Two other men drove up in a black Jeep and started shooting at them from inside the vehicle. Rodriguez sped away.

Jorge told this part of the story somewhat differently. He said Rodriguez and Lopez followed him in their vehicle but became suspicious and tried to pass him. Jorge chased Rodriguez while Rodriguez first turned right, then left. After the left turn, Jorge saw Martinez's Jeep stopped at a corner. Martinez got out of the Jeep, pulled out his gun, and shot out the windows of Rodriguez's car as Rodriguez tried to get away. Jorge aimed his own gun at Rodriguez's Camry and fired four or five shots. One of the shots went through Jorge's own windshield. Rodriguez and Lopez continued to flee in the Camry. Jorge said Fernandez had been in Martinez's Jeep, but by this point was in the area on his motorcycle and identified Fernandez in surveillance photographs.

Both Rodriguez and Jorge testified Jorge and Martinez pursued the Camry in their respective vehicles, continuing to shoot at the Camry, though Rodriguez did not identify the people pursuing him. Rodriguez tried to make a sharp right turn, was unable to negotiate it, lost control of the Camry, and struck a stop sign. Jorge, who could not stop his Charger in time, drove over a curb and into some bushes. According to Jorge, Martinez and Rolando pulled up in the Jeep and stopped in the middle of the street.

Rodriguez confirmed seeing the Jeep had stopped near the Camry. Rodriguez got out of the Camry, told Lopez to follow him, and fled the area on foot. Rodriguez said he looked back and saw one of the men from the Jeep holding Lopez at gunpoint and the other man was shooting at Rodriguez. According to Jorge, Martinez waited in the driver's seat of the Jeep while Rolando got out of the passenger's seat, grabbed Lopez from the Camry, and threw him in the back seat. Rodriguez was shot in the leg but escaped. Martinez told Jorge to get in the Jeep with them. When Jorge hesitated, Martinez sped away without him. Jorge hitched a ride back to the minimart. The driver who picked him up telephoned the police, and Jorge was later arrested.

C. *The Investigation*

A detective with the Riverside County Sheriff's Department responded to the crash site. He found the Charger crashed at the corner of a housing complex and the Camry a little further down, crashed against a horse rail. There were glass fragments in the back seat of the Camry and bullet holes all over the car. The detective found a Walther P22 semiautomatic pistol on the driver's side floorboard of the Charger. It included a magazine with nine live .22-caliber rounds. He also found a Kydex holster, a live .22-caliber bullet, two spent casings, a baggie containing 20.5 grams of methamphetamine, and $41 in cash. The Charger had been stolen from someone in Washington.

Law enforcement also found rounds from at least two different guns along the route Rodriguez had driven in an attempt to get away from the gunfire. They found 11

9

nine-millimeter luger casings at one location and 9 nine-millimeter luger casings and four .22-caliber casings at a second location.

D. *The Statements of Martinez and Fernandez*

Police identified Martinez and Fernandez as suspects and interviewed both, in Martinez's case before they had determined what happened to Lopez. Both spoke with the police without the assistance of lawyers. Fernandez gave a second interview five months later. The prosecution played video recordings of these lengthy interviews for the jury.

1. *Martinez's statement*

The investigators interviewed Martinez three days after the shooting. Martinez's story shifted as the interview progressed. At first, he said some men from Mexico were after him because he had lost $2 million while working for them in Iowa several years earlier. He said the police pulled him over, took the money, and gave him a receipt. On the day of the shooting, he said, he went to the minimart to buy a soda, but when he got back in his Jeep, some men followed him in an SUV and started shooting at him. He believed the men were after him because of the lost $2 million. He said he stopped his Jeep at an intersection, got out, and ran away, leaving his cell phone in the vehicle. According to this story, he wasn't in possession of his Jeep at the time of the assault on Lopez.

However, when pressed, Martinez changed his story. He said the men in the SUV had previously asked him to take a truck to Sinaloa, Mexico. He did as he was asked,

drove the truck filled with drugs from Michoacan to a house in Sinaloa, and received $1,000 for doing the job. He said he was then driven to the Sinaloa airport, and he flew home. However, he said he lost $2 million during the drive, and the men had come to collect on the debt.

The investigators told Martinez they had surveillance footage which contradicted his story. They said the video showed Martinez paying for his soda, talking to the driver of a silver Charger, approaching and getting into a Jeep Cherokee parked at the gas pumps, the same vehicle that was later involved in the chase which had ended in two cars crashing, a shooting, and an abduction. They told him they knew he was in the Jeep with a second person. Martinez said he knew nothing about those events and denied there was a passenger in his Jeep. He acknowledged talking to someone while he was in the minimart but said he just told the man to move out of the way. Martinez denied having a gun that night, participating in the shooting, or taking Lopez anywhere after it was over. He said he had abandoned his Jeep and phone, but this time he said it was because he owed a lot of money on a loan for the Jeep and couldn't make payments.

Investigators asked Martinez for the name of the man in the Charger. Martinez identified Jorge. Asked why he was angry at Jorge that day and what happened inside the minimart, Martinez said he and Jorge just happened to be there at the same time. After they left, "I followed Jorge, yeah, I went that way. It was . . . kind of stupid. It was the east, what's he gonna do." Martinez said he did not know whether Jorge was shooting at anyone. He denied he was shooting.

11

Investigators showed Martinez a photo of Lopez. Martinez said he was in a Mexican cartel and used to be his boss. He said Lopez was a "big guy", a "drug dealer[]" in crystal, and the $2 million Martinez had lost belonged to him. Martinez said that on August 11, he received a call from someone in a cartel in Michoacan who asked him to pick up "some guy" in Moreno Valley. They said they would forgive the $2 million debt if he did. Martinez said he took Lopez out of Lopez's car and put him in the Jeep. But he denied leaving with Lopez, instead he claimed someone else pulled him over, took Lopez from the Jeep, and drove away with him.

Investigators asked Martinez why he shot at the victims. Martinez initially denied shooting. However, confronted with the surveillance footage he said, "All right, but I shoot at him on this side, the driver's side." He said Jorge was also shooting. Martinez then revised his story from the beginning. He said he had stopped at the minimart, bought a soda, and spoke to Jorge, like before. But he added that Jorge had pointed Lopez out and said, "[H]e's right here. Get him." Martinez responded, "You get him." Instead, they followed Lopez. According to Martinez, Jorge and Rodriguez got into a shootout. Both cars crashed. Martinez stopped his Jeep, took Lopez out of the passenger seat of the Camry, and put him in the front seat of his vehicle. But then four men in a Suburban stopped Martinez and took Lopez from the Jeep. Martinez said he fired six or seven shots at the vehicle and blew out its front windows. However, the men escaped with Lopez, and Martinez denied knowing what happened to him, saying he was probably in Mexico.

12

## 2. *Fernandez's statement*

Fernandez was interviewed on August 30, 2013 and January 28, 2014. Fernandez consistently denied any involvement in the conspiracy or shooting. He did admit he had been a drug dealer in Washington and had served a prison sentence for that crime.

Shown surveillance footage of himself riding his motorcycle near the minimart during the time period of the offenses, Fernandez stated, "So that's me, right?" To counter this video evidence, Fernandez presented two defense experts who analyzed video clips from the minimart and from Fernandez's storage unit and opined that the person at the storage unit, confirmed to be Fernandez, was not the same person as the one at the minimart.

## E. *Discovery of Lopez's Dead Body and Other Evidence*

On August 16, 2013, Lopez's decomposing body was discovered in a concrete culvert in a remote area of Moreno Valley. Law enforcement found five nine-millimeter shell casings nearby. The first was on the west side of the roadway on the shoulder, the second was in the street, the third was on the right shoulder, and the fourth and fifth were by the culvert near the body.

A forensic pathologist performed an autopsy on Lopez's body. The body was in a moderate state of decomposition indicating Lopez had been dead at least several hours but more likely for a matter of days. He had two gunshot wounds to the head. One entered his forehead and exited the left side of his head. Another entered his left cheek and exited his right ear. It was impossible to tell which gunshot came first. Each was

13

independently fatal. The pathologist concluded multiple gunshot wounds to the head caused Lopez's death.

A few days after the shooting, officers executed a search warrant at Martinez's home in Moreno Valley. They found an empty Smith & Wesson gun case under his bed and two Colt 1911 .45-caliber handguns. They also found evidence Martinez was in possession of the Jeep involved in the crime. Ten days after the shooting, a worker for Southern California Edison found a Smith & Wesson Parabellum nine-millimeter semiautomatic pistol on a desolate road in Moreno Valley. The gun was empty and had no magazine.

In a search of a storage unit Fernandez rented, police found a portion of a motorcycle seat and Fernandez's motorcycle helmet. The motorcycle itself wasn't in the unit. A search of the browsing history on Fernandez's phone revealed that on August 14, 2013, he made three searches under the words, "Shooting last Sunday at Cactus and Redland Boulevard, California." He also searched for an accident occurring in Moreno Valley and visited the sheriff-coroner's website.

Later, police found Martinez's Jeep Cherokee abandoned in a neighborhood in Chula Vista, in San Diego County. The Jeep was towed to the Moreno Valley Sheriff's station for processing. In it, they found a live round underneath the right front passenger seat. The round had been cycled but not fired through a Smith & Wesson. DNA testing revealed the presence of bodily fluids belonging to Lopez on the bullet. Although

someone had tried to wipe down the inside of the Jeep, a forensic analysis showed blood in the center and right back seats. The blood was Lopez's.

F. *Evidence About Appellants' Connection to Santa Muerte Worship*

In the search of Martinez's home and Fernandez's storage unit, police found posters of Santa Muerte and several figurines of Santa Muerte in the garage.

The prosecution sought to introduce the evidence that Fernandez and Martinez worshipped Santa Muerte, as well as the testimony of an officer experienced in narcotics cases explaining that people involved in the narcotics trade often worshipped the figure. Appellants both objected the evidence was irrelevant and unduly prejudicial.

At a pretrial Evidence Code section 402 hearing, an investigator testified Santa Muerte is "almost a folk character" and part of "a folk religion in Mexico." He said both criminals and non-criminals "follow Santa Muerte," but said drug traffickers "believe that the Santa Muerte will protect the transportation of their drugs and will protect their own safety during these operations." The investigator said he didn't know how many people worship Santa Muerte worldwide or how many of those worshippers were involved in the drug trade. He conceded he had investigated several hundred drug cases in his career and only five to 10 involved Santa Muerte paraphernalia. The investigator described the objects related to Santa Muerte police had found in the possession of Martinez and Fernandez.

The trial judge determined the evidence was probative because it went to "a central issue" of the People's case, namely, that the defendants were "part of an

15

organization whose purpose is buying, selling, and transporting drugs." The judge concluded the probative value outweighed the risk of unfair prejudice without providing a detailed analysis. He therefore allowed the evidence to be admitted at trial.

At trial, the prosecution elicited testimony about the Santa Muerte displays police had found. A different investigator testified about the significance of that evidence, concluding it indicated Fernandez and Martinez were involved in the drug trade. The investigator conceded he had no idea how many people worshipped Santa Muerte worldwide, or what proportion of those worshippers were involved in the drug trade.

The prosecutor relied on the evidence in closing argument. He mentioned it several times and concluded Fernandez and Martinez were more likely to be guilty of the charged crimes because they're the type of person who commit such crimes.

G. *The Verdicts and Sentences*

The Riverside County District Attorney charged appellants with murder (Pen. Code, § 187, subd. (a), count 1, unlabeled statutory citations refer to this code), kidnapping (§ 207, subd. (a), count 2), and attempted willful, premeditated, and deliberate murder (§§ 664/187, subd. (a), count 3). The district attorney alleged two special circumstances related to the murder count—defendants had committed an intentional killing by means of lying in wait (§ 190.2, subd. (a)(15)) and while engaged in the crime of kidnapping (§ 190.2, subd. (A)(17)(B)). The district attorney also alleged Martinez had personally and intentionally discharged a firearm within the meaning of

16

section 12022.53, subdivision (c) and section 1192.7, subdivision (c)(8) while committing the kidnapping and attempted murder offenses.

A jury found both appellants guilty on all three counts and found the special circumstances allegations true. The trial judge sentenced Fernandez to prison for a total term of eight years, plus seven years to life, plus life without the possibility of parole. The judge sentenced Martinez to prison for a total term of 48 years plus life without the possibility of parole.

Martinez and Fernandez filed timely notices of appeal.

## II

## ANALYSIS OF GUILT ISSUES

A. *Corroboration of Accomplice Testimony*

Jorge, who admitted being an accomplice to the conspiracy to kill Lopez as well as one of the shooters, testified against Martinez and Fernandez. His testimony was an important part of the prosecution case against both defendants. Because he was an accomplice, however, the prosecution could not rely on his testimony alone. Fernandez argues insufficient evidence corroborated Jorge's testimony. Martinez joins the argument.

The requirement of corroboration is statutory. "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.)

17

Though accomplice testimony must be corroborated, the corroborating evidence need only "tend[] to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1022 [cleaned up].) "The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration." (*People v. Dalton* (2019) 7 Cal.5th 166, 245 [cleaned up].) The independent evidence doesn't have to corroborate every fact about which the accomplice testifies. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) Nor does the independent evidence need to independently establish every element of the offense. (*People v. Williams* (2008) 43 Cal.4th 584, 636.)

We don't lightly displace the jury's finding on review. "Unless a reviewing court determines the corroborating evidence should not have been admitted or that it could not reasonably tend to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal." (*People v. Szeto* (1981) 29 Cal.3d 20, 25 [cleaned up].)

In our view, the evidence independent of Jorge's testimony was sufficient to connect Fernandez to the commission of the crime and to give the jury a reasonable basis for finding the accomplice's testimony to be true. Surveillance video at the minimart confirms he was in the area, on his motorcycle, at the time of the offenses. Fernandez can be seen near Martinez's Jeep as well as Jorge's car. It also shows Fernandez in the minimart, talking to Martinez. A defendant's presence at the crime scene, while not

18

independently sufficient corroboration, can play a role in corroborating accomplice testimony. (*People v. Williams* (2013) 56 Cal.4th 630, 679; *People v. Williams* (1997) 16 Cal.4th 635, 681.) Also relevant is the fact Fernandez told investigators he wasn't at the scene. Making false or misleading statements to authorities can be corroborating evidence. (*People v. Vu*, *supra*, 143 Cal.App.4th at p. 1023.)

There was also independent evidence Fernandez and Jorge were in close contact at the time of the offense. Cell phone records may be used to corroborate an accomplice's testimony. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 124.) Jorge had Fernandez's work and home numbers saved in his phone. In the weeks and days leading up to the shooting, Jorge and Fernandez were in regular phone contact. On the day of the shooting, Jorge was alternately in contact with Fernandez and Lopez. In addition, the Walther P22 semiautomatic pistol recovered from Jorge's Charger had been stolen from someone in Washington, where Fernandez had lived and run a business. This evidence tends to support Jorge's testimony that Fernandez gave him the gun he used in the killing. The phone search also showed Fernandez had conducted several Google searches in the days after the offense looking for information relating to the shooting. All of this independent evidence corroborates Jorge's testimony about Fernandez's involvement in the shooting and its planning.

Independent evidence also established Fernandez had a motive to kill Lopez. Fernandez owed Lopez a considerable amount of money lost when Luis was detained by police while making a delivery on Fernandez's behalf, and Lopez was threatening

Fernandez's family in an effort to obtain payment. Luis testified and refused to answer questions straightforwardly, however an investigator who had interviewed Luis testified he told her at the time of his arrest that he was acting at Fernandez's direction. This evidence corroborates Jorge's testimony by establishing Fernandez had a motive and the opportunity to commit the offense. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1177.)

The evidence corroborating Jorge's testimony against Martinez was even stronger. Though his story shifted around during his interviews with law enforcement, he eventually admitted he was involved in the car chase and that he fired six or seven shots at Lopez's vehicle. Martinez said he had a Remington nine-millimeter gun and he shot out Lopez's front windows. He said he wanted to get Lopez, but didn't care about Rodriguez. He also acknowledged knowing no one was going to pay Lopez at their meeting, but that Lopez would be killed. These extra-judicial statements adequately corroborated Jorge's testimony. (*People v. Gurule* (2002) 28 Cal.4th 557, 628.)

But there was more. Rodriguez said a black Jeep was involved in the incident. Rodriguez testified that after Jorge gave him directions which led to an uninhabited area, a black Jeep showed up and drove towards them. Two men got out of the Jeep and started shooting. Rodriguez escaped but then saw the Jeep parked on a road and the men in the vehicle shot at him again. Later, after he had crashed his vehicle and fled, Rodriguez saw one of the men from the Jeep pointing a gun at Lopez. Lopez's blood was detected on a PMC brand live round found in Martinez's Jeep as well as in the center and right rear

seats of the Jeep, which had been found cleaned up and abandoned in San Diego County. Thus, in addition to his own statement, the testimony of an independent witness and physical evidence tied Martinez to the crimes. We therefore conclude the jury heard sufficient evidence, independent of the accomplice's testimony, to reasonably conclude the accomplice was telling the truth.

Fernandez and Martinez also argue the trial judge erred by failing to instruct the jury on the need for corroboration. The People concede Jorge was an accomplice and the instruction was required. However, though failing to give the instruction was error, it was harmless because "[e]ven where accomplice instructions were required, [the California Supreme Court has] found no prejudice where, in fact, the witness's testimony was sufficiently corroborated." (*People v. Boyer* (2006) 38 Cal.4th 412, 467.)

B. *Admission of Santa Muerte Evidence*

Fernandez and Martinez argue the trial court erred by allowing evidence showing they were followers of Santa Muerte and allowing law enforcement to testify those practices tied them to the drug trade.

While investigating the shooting, police officers found what could be characterized as shrines to Santa Muerte, a folkloric figure who has been associated with people involved in the illegal drug trade. After a preliminary hearing, the trial judge concluded the evidence was relevant and not unduly prejudicial, and allowed the evidence at trial.

Thus, the jury heard testimony that police found a poster of Santa Muerte, and several figurines of Santa Muerte in Martinez's home and a storage unit rented on Fernandez's behalf. An investigator said the Santa Muerte evidence indicated Fernandez and Martinez were in fact involved in the drug trade. In closing argument, the prosecutor relied on the evidence and argued Fernandez and Martinez were more likely to be guilty of the charged crimes.

Courts have reached different conclusions about the admissibility of evidence that defendants implicated in the drug trade had maintained shrines dedicated to Santa Muerte and similar figures. In *United States v. Medina-Copete* (10th Cir. 2014) 757 F.3d 1092, the defendants were charged with trafficking in narcotics and firearms offenses. During a vehicle stop, defendant was holding a written prayer to Santa Muerte in her hands, reading it to herself. The prosecution introduced the prayer and the testimony of a United States marshal who had extensively studied "how the Mexican drug traffickers involve the spiritual world in their activity." The trial judge screened the testimony for reliability as expert testimony and allowed it. (*Id.* at p. 1098.) At trial, the expert explained many people pray to Santa Muerte, including drug traffickers and criminals, and said the defendant's prayer was atypical in asking for protection from law enforcement. (*Id.* at p. 1099.) The Tenth Circuit United States Court of Appeals, analyzing admissibility as expert testimony, concluded the trial judge abused his discretion in allowing the testimony because it didn't have an adequate evidentiary foundation.

The Eighth Circuit Court of Appeals reached a contrary conclusion in *United States v. Holmes* (8th Cir. 2014) 751 F.3d 846. There, the defendants were charged with conspiracy to possess methamphetamine with the intent to distribute. A law enforcement officer linked drug trafficking to shrines of another "[drug] saint" found in a defendant's home. He explained the figure was a "'narco-saint' hailed as a 'Mexican Robin Hood'" but allowed he was also a patron saint of the poor and many people not involved in drug trafficking worshipped him. (*Id.* at p. 849.) The Eighth Circuit rejected defendants' claims that the evidence was irrelevant and unfairly prejudicial. The court concluded "drug iconography in the defendant's home is highly relevant," because the government had to prove a drug trafficking conspiracy. (*Id.* at p. 851.)

We need not resolve the issue in this case, because the evidence that Fernandez and Martinez worshipped Santa Muerte was of minor importance. It is undoubtedly true, as the People argue, that appellants' involvement in the drug trade was an important issue in the case. They were not charged with drug offenses, but the background regarding their failed drug transactions provided the *factual* scaffolding upon which the prosecution built its case. However, the evidence of this background was overwhelming, leaving aside the indications that Fernandez and Martinez worshipped Santa Muerte. The jury heard firsthand from Jorge what happened on August 11, 2013, and about what led to those events. His testimony was supported by text messages and phone calls and the admissions of both men that they trafficked drugs in their interviews with the police. In the setting of so much evidence on the point, it is impossible to conclude appellants were harmed by

23

the admission of evidence that they shared an interest in Santa Muerte with many people involved in the illegal drug trade. It's not reasonably probable appellants would have received more favorable verdicts absent the Santa Muerte evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

C. *Informing the Jury Fernandez's Wife Invoked Marital Privilege*

Fernandez argues the trial judge violated his federal constitutional right to due process when he told the jury his wife, Cecilia, had invoked her statutory right not to testify against her husband. Martinez joins the argument.

Though she testified at the preliminary hearing in this case, Cecilia invoked the spousal privilege and elected not to testify at trial. The court deemed her unavailable and allowed her preliminary hearing testimony to be read to the jury. The judge explained to the jurors that Cecilia "indicated to me that she did not wish to testify . . . against her husband, and that is a privilege under the Evidence Code. And she also did not wish to testify as to private marital confidential communications and discussions that she had with her husband. [¶] . . . [¶] Now, when this case went to preliminary hearing, she testified for about 10 or 12 minutes without asserting the privilege. After about 10 or 12 minutes, she asserted the spousal privilege and, so, therefore, there were no further questions asked of her. [¶] And, so, because I have determined that she's unavailable as a witness in this matter, then the Court is going to allow [the prosecutor] to have a reader read to you the transcript from the preliminary hearing before she exercised her privilege."

Cecilia's preliminary hearing testimony was then read to the jury. She said at the time of the shooting, she and Fernandez had lived in Moreno Valley for 10 months and before that she had lived in Mount Vernon, Washington—for 22 years overall and with Fernandez beginning in 1998. She said she knew Martinez, had visited his home, and had seen shrines to Santa Muerte at his house. She confirmed she had rented the car Luis had used to transport drugs and cash from Washington. She then claimed not to remember several things related to the time of the shooting. However, when asked whether she told an investigator she knew Fernandez was selling drugs in Washington, she invoked her spousal privilege and refused to testify further.

Evidence Code section 971 precludes an adverse party from calling a party's spouse as a witness, without the spouse's prior express consent. Evidence Code section 980 gives a spouse or domestic partner, subject to certain exceptions, "a privilege during the marital or domestic partnership relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he or she claims the privilege and the communication was made in confidence between him or her and the other spouse while they were spouses." Counsel may not comment on a witness's invocation of a privilege, and the court must, on request, instruct the jury "that no presumption arises because of the exercise of the privilege and that the jury may not draw any inference therefrom." (Evid. Code, § 913.)

In the context of the right not to testify against yourself, the California Supreme Court has held that "permitting the jury to learn that a witness has invoked the privilege

25

against self-incrimination serves no legitimate purpose and may cause the jury to draw an improper inference of the witness's guilt or complicity in the charged offense." (*People v. Cudjo* (1993) 6 Cal.4th 585, 619.) For that reason, "it is the better practice for the court to require the exercise of [that] privilege out of the presence of the jury." (*People v. Frierson* (1991) 53 Cal.3d 730, 743.) Though it has stopped short of commanding that approach, the court has "commended [it] because it operates as a means by which to avoid the potentially prejudicial impact of the witness asserting the privilege before the jury." (*People v. Smith* (2007) 40 Cal.4th 483, 517.)

The same reasoning suggests the trial court correctly held a hearing outside the presence of the jury to determine whether Cecilia would exercise her spousal privilege but should not have advised the jury that she would in fact exercise it. The better practice would have been to permit a reading of the preliminary hearing transcript without any comment on why Cecilia was unavailable to testify in person.

Regardless, we conclude the disclosure didn't prejudice Fernandez or Martinez. First, the trial judge instructed jurors that "[a] witness may have refused to answer questions that called for privileged information. Under the law, Cecilia [] was justified in refusing to answer certain questions. Do not consider her refusal to answer for any reason at all, and do not guess what her answer might have been." Fernandez's counsel emphasized this point in closing argument. "My client's wife has a right not to testify against her husband, just like any of you would have with your spouse. You don't have to come in and testify against your husband or wife. You can't—you have to set that aside.

26

You can't consider it." We presume the jury followed the instruction and did not draw any inferences from the invocation. (*People v. Smith*, *supra*, 40 Cal.4th at pp. 517-518.)

Fernandez argues the admonition was not enough and speculates jurors couldn't help but infer Cecilia had "significant evidence" against Fernandez, especially since the trial judge described what she had done as invoking her right not to testify "against her husband." We think Cecilia's preliminary hearing testimony does not, as a factual matter, underwrite the inference she had significant evidence Fernandez was involved in the shooting. She stopped testifying at the preliminary hearing when questioned about whether she knew Fernandez was selling drugs while they lived together in Washington. Such an admission could have far-reaching consequences for herself and Fernandez that have nothing to do with his trial for a murder, committed nearly a year after they moved away.

In any event, our Supreme Court has found an instruction similar to the one given here cured any prejudice from a witness's invocation of the Fifth Amendment right against self-incrimination. (*People v. Smith*, *supra*, 40 Cal.4th at pp. 517-518 ["[t]he crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions"].) We conclude the same logic applies to cases involving the spousal privilege.

D. *Sufficiency of the Evidence on Murder and Special Circumstances*

Fernandez and Martinez argue the prosecution presented insufficient evidence to support the jury's first degree murder verdicts and two of their special circumstance

27

findings. They argue there is insufficient evidence Lopez's murder was accomplished by means of (1) discharging a firearm from a motor vehicle, (2) lying in wait, or (3) kidnapping.

The prosecution tried appellants on four separate theories of first degree murder–premeditation, lying in wait, discharge of a firearm from a vehicle, and kidnapping felony murder, and the trial judge instructed the jury on all four. "The defendant has been prosecuted for first degree murder under the following theories: [¶] 1. The murder was willful, deliberate, and premeditated; [¶] 2. The murder was committed by lying in wait; [¶] 3. The murder was committed by firearm discharge from a vehicle; [¶] 4. The murder was committed during the commission of kidnapping."

Fernandez and Martinez challenge the sufficiency of the evidence related to three of the four theories, but do not contest that sufficient evidence supported a first degree murder conviction on the theory that the murder was premeditated. They argue knocking out any one or more of the theories of first degree murder requires reversal. As the trial judge instructed, the jury could "not find the defendant guilty of first degree murder unless all of [the jurors] agree that the People have proved that the defendant committed murder . . . [however] all of [the jurors] do not need to agree on the same theory." Thus, it was legally permissible to convict Fernandez and Martinez of first degree murder if—as an example—six jurors found they committed the murder in a premediated fashion but not by firing a gun from inside a vehicle, while the other six jurors found they committed the murder by firing a gun from inside a vehicle but did not act with premeditation.

28

The jury returned general verdicts that both Fernandez and Martinez were guilty of first degree murder. We know from their special circumstances findings that the jury unanimously found both men committed the murder while engaged in committing kidnapping and by means of lying -in wait for the victim. We also know the jury found both men acted willfully, deliberately, and with premeditation when they attempted to murder the victim's driver, which occurred at the same time they were firing at the murder victim. The jury made no finding that discloses whether they concluded Fernandez and Martinez carried out the murder by means of shooting from inside a vehicle.

The question we face is whether the murder verdicts stand if one or more of the potential bases for conviction is valid but one or more of the other potential bases for conviction was invalid because they're not supported by substantial evidence. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1123-1124 (*Guiton*).) This is a case "in which the jury has merely been 'left the option of relying upon a *factually* inadequate theory,' or . . . phrased slightly differently, [a] case[] in which there was an 'insufficiency of proof.'" (*Id.* at p. 1128.) "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*Id.* at p. 1129.)

Fernandez argues to the contrary that this case is one in which the legal theory was inadequate. (*Guiton*, *supra*, 4 Cal.4th at p. 1128 [distinguishing cases where "'a particular

theory of conviction . . . is contrary to law,' or, phrased slightly differently, cases involving a '*legally* inadequate theory'"].) He argues the questions whether the killing occurred "by means of" shooting from a vehicle or at a time too distant from the ruse that implicated the lying-in-wait theory are legal questions outside the jurors' own intelligence and experience. We disagree. Appellants themselves articulate their arguments in terms of the sufficiency of the evidence to support these theories of guilt. We agree with the approach, and conclude the questions presented to the jury—whether the murder was committed by certain means—fall directly within the jury's factfinding expertise. For that reason, we think the rule articulated by *Guiton* applies here. There is no reason to reverse the jury's verdict—guilty of premeditated murder—that all parties agree is well supported by the record on the theory that some jurors may have found them guilty on an alternative and factually weak theory that the murder was committed by means of shooting the victim from inside a vehicle (a theory that doesn't require premeditation). We presume jurors are rational, and therefore capable of rejecting a factually weak theory even if the trial judge would have done better by excluding that theory from the jury instructions. (*Guiton*, at pp. 1128-1129.)

As a result, to take advantage of these alleged evidentiary deficiencies, Fernandez and Martinez must show there's some indication in the record that the jury *did* rely on the factually invalid theories to the exclusion of a factually valid theory. They argue the record *does* establish that the jury relied on the theories that appellants committed the murder by means of lying in wait and while committing kidnapping because the jury

30

affirmatively found they did so in passing on the special circumstances questions. They also argue we should infer the jury didn't reach the issue of premeditation because they didn't need to. We agree the findings establish the jury unanimously found they committed the murder by means of lying in wait and while engaged in kidnapping, but not that they did so to the exclusion of finding appellants acted with premeditation.

Nevertheless, because Fernandez and Martinez challenge the sufficiency of the evidence to support the special circumstances findings, we will address their arguments as they relate to the sufficiency of the lying-in-wait and kidnapping evidence. We will not take the time to discuss the sufficiency of the evidence that they committed the murder by firing a gun from a vehicle because there's no indication the jury relied on that theory.

### 1. Lying in wait

Fernandez and Martinez argue there was insufficient evidence to establish they committed the murder by means of lying in wait for purposes of both the felony murder verdicts and the special circumstance findings.

"All murder that is perpetrated by means of . . . lying in wait . . . is murder of the first degree." (§ 189, subd. (a).) Moreover, if a jury finds "[t]he defendant intentionally killed the victim by means of lying in wait," the offense is punishable by death or life in prison without the possibility of parole. (§ 190.2, subd. (a)(15).)

The lying-in-wait special circumstance requires "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) . . . a surprise attack on an

31

unsuspecting victim from a position of advantage." (*People v. Johnson* (2016) 62 Cal.4th 600, 629.) The same circumstances must be present for a conviction of first degree murder under a lying-in-wait theory. (*Ibid.*; *People v. Poindexter* (2006) 144 Cal.App.4th 572, 584-585.)

On a challenge to the sufficiency of trial evidence to support a jury's factual determinations, we review the whole record to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. We presume in support of the judgment the existence of every fact the trier of fact could reasonably infer from the evidence. If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Westerfield* (2019) 6 Cal.5th 632, 713 [cleaned up].)

The prosecutor's theory of the case against Fernandez was that he wasn't the actual shooter but that he had aided and abetted the murder by luring Lopez to Riverside County on the pretext of paying his debt and then sending Martinez, Jorge, and Rolando to execute him in a surprise attack. "A lying-in-wait special circumstance can apply to a defendant who, intending that the victim would be killed, aids and abets an intentional murder committed by means of lying in wait." (*People v. Johnson*, *supra*, 62 Cal.4th at p. 630.) For Fernandez, we ask whether substantial evidence shows he aided and abetted

the killing with the intent that Lopez be killed and that the killer intentionally killed Lopez by means of lying in wait. (*Ibid.*)

The prosecutor's theory of the case against Martinez was more direct. He, too, participated in planning to lure Lopez to a surprise attack. And the jury could have found him guilty of lying-in-wait murder as an aider and abettor if they found another person committed the killing in the end. However, the prosecutor also sought to prove Martinez was one of the people who actually carried out the surprise attack on Lopez and that he was the actual killer.

Viewing the evidence in the light most favorable to the verdicts, we conclude the requirements for lying-in-wait murder and the lying-in-wait special circumstance were supported by substantial evidence. (*People v. Johnson*, *supra*, 62 Cal.4th at p. 630.) From Jorge's testimony about Fernandez's debt to Lopez, Lopez's threats, and the discussions in which Fernandez, Martinez, and Jorge concocted the plan to lure Lopez to Riverside County and kill him, the jury reasonably could infer both Fernandez and Martinez harbored an intent to kill Lopez.

The record also contains substantial evidence Fernandez aided and abetted the killing. "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime." (*People v. Johnson*, *supra*, 62 Cal.4th at p. 630.) Again, Jorge's testimony established both

33

defendants knew of the unlawful purpose. Jorge testified Fernandez facilitated the commission of the offense by offering to pay Martinez $30,000 to $35,000 to kill Lopez as well as by supplying Jorge with a phone to use to lure the victim, and a firearm to use in the offense. Substantial evidence also establishes Martinez was present throughout the assault on Lopez and Rodriguez and participated directly in carrying out the planned hit. The jury could reasonably conclude from this evidence that both men knew of the plan to kill Lopez, intended to facilitate that plan, and at least acted to aid the other parties to the conspiracy in committing the killing.

Fernandez argues the evidence didn't support finding the murder was committed by lying in wait because there was no evidence that the perpetrators were watching and waiting for Lopez. Instead, they say, Martinez, Jorge, and Rolando attacked Rodriguez and Lopez immediately upon approaching them. This argument leaves out what happened before the shooting. Fernandez gave Jorge a phone to use in reaching out to Lopez. Jorge used the phone to reach out to Lopez the night before and the next day Jorge used the phone to guide Lopez from place to place and ultimately to a minimart where Martinez and Fernandez appeared, without the victim's knowledge. Jorge then directed the victim to another, more remote location, and it was during this last leg of the journey that Martinez, Rolando, and Jorge found the opportunity to open fire. This evidence provided the jury with a reasonable basis to find Fernandez and Martinez were watching and waiting for the opportunity to spring their trap and kill Lopez.

Fernandez also argues the surprise attack didn't result in the murder. He points to the testimony of Rodriguez, who said the initial shooting was unsuccessful, forcing the attackers to pursue Rodriguez and Lopez and try again. According to Fernandez, that broke the link between the surprise attack and the later killing and even allowed the victims to "outpace their pursuers." We disagree with this characterization. Martinez, Jorge, and Rolando did not spring a surprise attack that failed and then regroup and pursue a new plan. The attack was continuous, and the victims were in jeopardy continuously. In any event, Jorge testified the shooting started after Rodriguez and Lopez passed a traffic sign at a street corner near the minimart. He said Martinez was parked at a corner and got out and started shooting when Rodriguez's vehicle went by. A car chase ensued until Rodriguez lost control of his vehicle and crashed. At that point, Lopez was abducted and thrown into the back of the Jeep. Given our conclusion Jorge's testimony was adequately corroborated, the jury were entitled to believe this version of events and find there was no break in time between the surprise attack and the kidnapping which led to Lopez's murder. (*People v. Fleming* (2018) 25 Cal.App.5th 783, 788-789.)

Finally, both Fernandez and Martinez argue the evidence didn't support a finding that the killing was accomplished by means of lying in wait because the evidence shows the perpetrators didn't kill Lopez at the scene of the car crash, but rather pulled him into Martinez's vehicle and drove off. They say the evidence establishes only that the killing occurred some indeterminate time later.

However, there's no requirement that a murder be committed during or shortly after the springing of a surprise attack to support a finding that it occurred by means of lying in wait. Under an earlier version of section 190.4, subdivision (a), the People were required to prove "the defendant intentionally killed the victim *while* lying in wait." (Italics added.) The special circumstance thus previously did require a close temporal proximity between the lying in wait and the murder. (*Domino v. Superior Court* (1982) 129 Cal.App.3d 1000, 1011-1012.) To support the special circumstance finding, "the killing [had to] take place *during* the period of concealment and watchful waiting or the lethal acts must begin at and flow continuously from the moment concealment and watchful waiting ends." (*Id*. at p. 1011, italics added.) The lying-in-wait murder statute (§ 190.2, subd. (a)(15)) never included this limitation but allowed a conviction for first degree murder any time the murder was committed "by means of" lying in wait. In 2000, California voters changed the word "while" in the special circumstance to "by means of," as in the murder statute. (*People v. Superior Court (Bradway)* (2003) 105 Cal.App.4th 297, 307-308.) As the court pointed out in *Bradway*, the change in language was designed to "permit the finding of a special circumstance not only in a case in which a murder occurred immediately upon a confrontation between the murderer and the victim, but also in a case in which the murderer waited for the victim, captured the victim, transported the victim to another location, and then committed the murder." (*Ibid*.) That's what the evidence in this case establishes, and we conclude there is a sufficient

36

evidentiary basis for the jury to conclude Fernandez and Martinez committed lying-in-wait murder and to conclude the lying-in-wait special circumstance was true.

Appellants make much of the fact the police found Lopez's body days after the shootout and argue there's no evidence that Lopez wasn't alive days later. However, Lopez's blood was found in the back seat of the Jeep. In addition, the forensic pathologist said Lopez had "more likely" been dead for days by the time police found his body. The jury could reasonably infer from this evidence that Lopez was shot shortly after he was forced into the Jeep or as soon as Martinez and Rolando could get him to a more remote location.

### 2. Kidnapping

#### a. Martinez

There was also sufficient evidence for the jury to find Martinez kidnapped Lopez and murdered him during the course of a kidnapping. "All murder . . . committed in the perpetration of . . . kidnapping . . . is murder of the first degree." (§ 189.) A defendant is also eligible for enhanced punishments—life without possibility of parole or the death penalty—if "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of . . . [kidnapping] in violation of Section 207, 209, or 209.5." (§ 190.2, subd. (a)(17)(B).)

To prove kidnapping, the prosecution must show: (1) the victim was unlawfully moved by the use of physical force or fear; (2) the movement occurred without the victim's consent; and (3) the movement covered a substantial distance. (*People v. Bell*

37

(2009) 179 Cal.App.4th 428, 435.) Here, the prosecution presented substantial evidence of all of those elements. Two witnesses testified one of the men in the Jeep moved Lopez into the Jeep by pointing a gun at him and then drove off. The jury could reasonably find Martinez used force or fear to move Lopez a substantial distance without his consent based on that evidence alone.

Martinez concedes the kidnapping occurred but argues there was insufficient evidence Lopez was murdered during the course of a kidnapping. Martinez argues the evidence contained evidentiary gaps, most importantly concerning how long Lopez was deceased and whether there was a gap between the kidnapping and the murder. However, the jury could reasonably infer from the presence of Lopez's blood in the Jeep, the decomposed state of his body when found, and the pathologist's testimony that it was more likely that he had been dead for days that the kidnapping and murder were part of a single course of events.

### b. *Fernandez*

Fernandez argues there was no evidence he aided and abetted the kidnapping, requiring reversal of the kidnapping special circumstance and his conviction for simple kidnapping. He argues there was no evidence he shared the intent to kidnap Lopez and the natural and probable consequences doctrine does not apply to fill the gap.

"An aider and abettor is someone who, with the necessary mental state, 'by act or advice, aids, promotes, encourages or instigates, the commission of the crime.'" (*People v. Smith* (2014) 60 Cal.4th 603, 616.) "A person who knowingly aids and abets criminal

conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable." (*People v. Medina* (2009) 46 Cal.4th 913, 920.) Moreover, members of a "conspiracy [are] liable for the acts of any of the others in carrying out the common purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design." (*In re Hardy* (2007) 41 Cal.4th 977, 1025-1026.)

Here, there was evidence Martinez, Fernandez, and Jorge concocted a plan to lure Lopez to Riverside County with a promise to pay him and then kill him instead. There was also evidence Jorge, in consultation with Fernandez and Martinez, directed Lopez to move to various locations, before meeting him at a minimart and then directing him to go to a more remote area where Jorge, Martinez, and Rolando shot at his vehicle and Martinez and Rolando abducted him at gunpoint. The jury could reasonably conclude from this evidence that it was foreseeable that carrying out the plot to kill Lopez in this way would not be simple and would make it necessary to move Lopez elsewhere before killing him.

The jury could also reasonably have concluded Fernandez directly aided and abetted the kidnapping based on Jorge's testimony that Fernandez was at one point in Martinez's Jeep and later driving a motorcycle in the vicinity and the surveillance video which showed him to be present at the minimart. Although Fernandez denied he was the

39

person on the motorcycle, the jury could reasonably have found his denials lacked credibility.

We therefore conclude substantial evidence supports the convictions of both Fernandez and Martinez for first degree murder and supports the jury's true finding on the two special circumstances that make them eligible for sentences of life without possibility of parole. Since there is no indication any jurors relied on the theory that the murder was committed by someone shooting from a vehicle, we will uphold the convictions and the true findings against these challenges.

E. *Sufficiency of the Evidence of Attempted Murder*

Fernandez argues the evidence doesn't support the jury finding him guilty of the premeditated attempted murder of Rodriguez, who was with Lopez in the Camry, and was shot while fleeing after the crash. He points out there's "no evidence that he participated in or directed the shooting of Rodriguez" nor "that he shared the intent to kill Rodriguez or conspired to kill him."

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Pettie* (2017) 16 Cal.App.5th 23, 52.) However, the defendant doesn't have to commit an element of the underlying offense. (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the

purpose of facilitating the direct perpetrator's accomplishment of the intended killing." (*Pettie*, at p. 52.)

As we've noted, there was substantial evidence that Fernandez participated in the plot to shoot Lopez, knew Rodriguez was in the car with Lopez, was present at the minimart just before the shooting occurred, and was riding a motorcycle in the vicinity during the shootout. Jorge testified he was in contact with Fernandez about how to set up the shooting and that Fernandez gave him the phone he used to lure Lopez. In carrying out the plan, Martinez, Jorge, and Rolando fired indiscriminately at Lopez's car, which Rodriguez was driving. After the car crashed, Rodriguez testified one of the men in the Jeep fired at him repeatedly as he fled on foot, even while the other man held Lopez at gunpoint. The jury could reasonably infer based on all this evidence that Fernandez, who was the ringleader and the would-be beneficiary of the crime, had the intent to kill not only Lopez but also his driver and at minimum gave encouragement to the perpetrators with knowledge of their intent to kill Rodriguez along with Lopez. (*People v. Foster* (2021) 61 Cal.App.5th 430, 445 [holding the jury reasonably inferred intent to kill and convicted of multiple counts of attempted murder where the defendant fired a semiautomatic weapon seven times into a group of rival gang members].)

F. *Requiring Fernandez to Share an Interpreter*

Fernandez argues the trial judge erred by allowing him to share an interpreter with Martinez while his wife, Cecilia, invoked the marital privilege and during the reading of her preliminary hearing testimony. Martinez joins in the argument.

41

At trial, the prosecution informed the trial judge that Cecilia had decided to invoke the marital privilege. The judge decided Cecilia should take the witness stand outside the presence of the jury to formally invoke the privilege. Because she didn't have an interpreter, the judge asked if one of the interpreters for the defendants could interpret for Cecilia, leaving the other interpreter to translate for both defendants in the interim. The court asked, "Is that agreeable with both of the defendants?" Counsel for Fernandez said, "That's fine." Counsel for Martinez didn't respond. The judge didn't ask for personal waivers from the defendants.

With Fernandez's interpreter assisting Cecilia, the trial judge asked if she wished to testify against her husband. She said no, and the court asked, "And, so, if I ask you that question in front of the jury, would your answer be the same?" She said yes, and the judge said, "Well, counsel, I don't see any need to have her do that in front of the jury." Cecilia then left the witness stand and returned to the witness room while the prosecution read her preliminary hearing testimony to the jury.

As we discussed above, Cecilia's preliminary hearing testimony was very limited because she invoked the privilege then too. She said she and Fernandez had lived in Moreno Valley for 10 months and in Mount Vernon and Washington for 22 years before that. He said she had lived with Fernandez since 1998. She knew Martinez, had visited his home, and had seen shrines to Santa Muerte at his house. She confirmed she had rented the car Luis had used to transport drugs and cash from Washington. She said she didn't remember several things related to the time of the shooting. Then she invoked her

spousal privilege when asked whether she told an investigator she knew Fernandez was selling drugs in Washington. After the reading was complete, Fernandez asked for an opportunity to talk to his counsel with the assistance of his interpreter. The court ordered a recess and they consulted.

The California Supreme Court has held article I, section 14 of the California Constitution "requires that when an interpreter is appointed for a non-English speaking accused, the accused has a constitutional right to the assistance of the interpreter throughout the entire proceeding." (*People v. Aguilar* (1984) 35 Cal.3d 785, 787 (*Aguilar*).) "The defendant's right to understand the instructions and rulings of the judge, the questions and objections of defense counsel and the prosecution, as well as the testimony of the witnesses is a continuous one. At moments crucial to the defense—when evidentiary rulings and jury instructions are given by the court, when damaging testimony is being introduced—the non-English speaking defendant who is denied the assistance of an interpreter, is unable to communicate with the court or with counsel and is unable to understand and participate in the proceedings which hold the key to freedom. Thus, the 'borrowing' of [an] interpreter, the accused's only means of communicating with defense counsel and understanding the proceedings, [is] a denial of a constitutional right." (*Id.* at pp. 790-791, footnote omitted.)

In *Aguilar*, the trial judge deprived the defendant of the focused services of his translator at critical points of the trial. Though the judge had properly appointed an interpreter at the outset of the trial, he borrowed the interpreter to translate the testimony

43

of two prosecution witnesses for the benefit of the court and jury. Defense counsel agreed to the process without consulting Aguilar. (*Aguilar*, *supra*, 35 Cal.3d at pp. 789-790.) The Supreme Court concluded the situation required more than one interpreter because it "'is nearly impossible for one interpreter to translate the testimony of a witness while simultaneously translating and listening to the discussions between defendant and counsel. It is in these circumstances that a defense interpreter is most needed to ensure adequate representation by the defendant's counsel.' [Citation.] Requiring two interpreters in cases such as the one before us has additional benefits to the criminal justice system because 'it is difficult for an interpreter who has worked closely with the defendant and his counsel in the preparation of the defense from the pretrial stage to translate the court proceedings impartially. Finally, a separate defense interpreter would serve to ensure the accuracy of the proceedings and witness interpreters.'" (*Id.* at p. 793.)

When there are two non-English speaking defendants, "the best and preferred means . . . is to require that each defendant have assigned to him an interpreter who remains at his side throughout the proceedings, unless such assistance has been waived." (*People v. Rodriguez* (1986) 42 Cal.3d 1005, 1013.) This way, "speculation regarding possible adverse consequences arising out of shared or absent interpreters can be avoided." (*Ibid.*) The Supreme Court has also established the waiver of the right to an interpreter may not take the form of acquiescence by counsel. (*Aguilar*, *supra*, 35 Cal.3d at pp. 794-795.) Instead, to ensure the defendant has knowingly and intelligently waived the right, the waiver must be personal to the defendant. (*Ibid.*)

44

The People do not contest depriving Fernandez of his own interpreter during the testimony of his wife was error. Nor do they contend his attorney's acquiescence to borrowing the interpreter constituted waiver. Indeed, they acknowledge "the trial court should have asked appellants to personally waive the right to their own interpreters before allowing one of the interpreters to be used by Cecilia."

Instead, the People argue we should affirm the convictions because the error didn't prejudice either defendant. The Supreme Court has established error in denying an accused with an interpreter is reviewed for harmless error under the standard announced in *Chapman v. California* (1967) 386 U.S. 18. (*People v. Rodriguez*, *supra*, 42 Cal.3d at p. 1012.) That standard is appropriate because "denial of an interpreter in any given case may take many forms . . . rang[ing] from complete failure to provide an interpreter to the momentary absence of an interpreter at an inconsequential moment in the proceedings." (*Ibid*.) Thus, denial of an interpreter for part of a trial may be deemed harmless if we are "'able to declare a belief that it was harmless beyond a reasonable doubt.'" (*Ibid.*)

We conclude this case is one where the error was harmless. This was a long trial centered on linking the defendants to a well-documented shootout which ended in one victim being wounded and another found dead a short time later. Fernandez's wife did not testify regarding the shootout, the killing, the conspiracy to kill the victim, or even her husband's participation in the drug trade, which, according to the People's theory, precipitated the offenses. At trial, she didn't testify at all, but instead invoked the marital privilege, and the trial judge declared her an unavailable witness. The judge allowed the

45

prosecution to read the transcript of her testimony at the preliminary hearing, but even that testimony was brief because she invoked the marital privilege there as soon as the prosecution asked her about her knowledge of her husband's prior participation in the drug trade—a fact established by Fernandez's own statements to the police. Thus, we conclude there's no likelihood the appellants would have received a better outcome, even if the interpreter was assisting Fernandez and helped him decide to challenge the introduction of her preliminary hearing testimony. Cecilia's testimony simply played little or no role in the appellants' convictions.

G. *Purported Misconduct During Closing Argument*

Fernandez argues counsel for Martinez committed misconduct during closing argument. Martinez doesn't join this argument.

In closing, Fernandez's counsel argued Martinez decided on his own to kill Lopez. He said the evidence showed "this enterprise got out of hand because Enrique [Martinez] decided to take the money and to make a murder out of something that wasn't a murder. It wasn't intended to be a murder." Fernandez says the response of Martinez's counsel constituted a direct attack on Fernandez's counsel when he responded, "I didn't know, coming in here, that I was working against two prosecutors. I didn't know that. Apparently [Fernandez's counsel] thinks it's in his interest to try to throw my client under the bus. I don't know why he's done that."

According to Fernandez, this accusation by Martinez's counsel was a way of saying Fernandez's counsel was so dishonest and unscrupulous that he was willing to

46

falsely charge Martinez with the murder in order to save his own client. He also claims the accusation reflected back on Fernandez because the jury would infer Fernandez had agreed to falsely accuse his codefendant for his own benefit. He argues this was a serious and prejudicial attack. (*People v. Woods* (2006) 146 Cal.App.4th 106, 116-117 ["'It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense' or to otherwise denigrate defense counsel"].)

This argument relies entirely on misconstruing counsel's comment. Contrary to Fernandez's argument, accusing his counsel of "throw[ing] him under the bus" doesn't imply the falsity of Fernandez's claim that Martinez acted alone. It simply implies Fernandez was conceding Martinez's guilt in an attempt to protect himself. There's nothing nefarious about such a comment. Martinez's counsel then said the choice to throw him under the bus didn't matter "because at the end of the day, this is a case about credibility" and focused his argument on the evidence, much of it showing Martinez acted from coercion by people, like Fernandez, higher up the food chain in the drug trade. We therefore conclude counsel's comment was neither misconduct nor prejudicial to Fernandez.

H. *The Investigation into Juror Misconduct*

Fernandez argues the trial judge failed to adequately investigate when he learned one juror (Juror No. 6) may have committed misconduct by saying something about the case to a second juror during the course of the trial. The second juror reported Juror No. 6's comments, and the trial judge interviewed Juror No. 6, dismissed her from the jury,

47

and replaced her with an alternate juror. Fernandez doesn't challenge those decisions but argues the judge should have investigated the second juror as well to determine whether she committed misconduct by discussing the case with Juror No. 6 and whether she had questionable motives for trying to have Juror No. 6 removed.

The second juror sent a note to the trial judge in the middle of trial to report concerns about Juror No 6. The note reported "Juror Number 6 said, 'I don't know what we are doing here.' I asked, 'Where?' Juror Number 6 said, 'in the courtroom.' I said, 'It's a trial.' Juror Number 6 said, 'I know, but what are we supposed to be doing.' I said, 'Well, the defendants are two innocent men. The assistant D.A.'s job is to prove to us without a reasonable doubt they are guilty.' Juror 6 said, 'How?' I said nothing further. Juror 6 said, 'The one with the attorneys and the guys that did it.' I said, 'Well, the attorneys are the ones doing the talking, asking the questions.' Juror 6 said, 'I can't hear a word those two say.' I said, 'There are three attorneys.' Juror 6 said, 'Only two? Are you sure?' I asked, 'If you can't hear them, how are you writing notes?' Juror 6 said, 'I hear the answers and I try to figure out the question.' I said, 'You should let the judge know you can't hear.' Juror 6 said, 'It's okay. I'm retired and I have nothing else to do.' She and I stopped talking to each other."

The judge called Juror No. 6 into the courtroom and asked her about the conversation the note reported, focusing initially on the comment that she couldn't hear the attorneys. She acknowledged the conversation "was similar to that, but not exactly that." She said, "I was just saying I wish they would talk louder. It's not that I couldn't

hear them. It's that I could hear them better if they talked louder." Asked about the other reported comments, she said she didn't recall making those comments and didn't know if she made the remainder of the statements attributed to her. She said she could be a fair, impartial juror.

The judge asked Juror No. 6 to step into the hallway. The judge then reported to counsel he thought Juror No. 6 had for the most part denied making the statements but had violated his admonition about not talking about the case. He said he didn't think there was a need to call in the second juror because there was probable cause to excuse Juror No. 6. He also expressed concern that the juror couldn't hear the attorneys. The prosecutor and Fernandez's counsel agreed with the court's proposal, and Martinez's counsel said nothing. The judge then called Juror No. 6 back in, excused her, and replaced her with an alternate.

"Trial courts may remove any juror who 'becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty. . . .' (§ 1089.) A trial court learning of grounds for dismissal 'has an affirmative obligation to investigate.' [Citation.] However, '[b]oth the scope of any investigation and the ultimate decision whether to discharge a given juror are committed to the sound discretion of the trial court.'" (*People v. Duff* (2014) 58 Cal.4th 527, 560.)

Fernandez argues the second juror's participation in the conversation obligated the judge to inquire further. We disagree. "[N]ot every incident involving a juror's conduct requires or warrants further investigation. 'The decision whether to investigate the

49

possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.'" (*People v. Cowan* (2010) 50 Cal.4th 401, 506.) Here, the only thing the second juror did that could be construed as misconduct was participate in the conversation Juror No. 6 initiated. But her responses were limited to clarifying procedural aspects of the trial about which Juror No. 6 expressed confusion and encouraging her to let the judge know she couldn't hear the attorneys. There is no suggestion at all that she spoke about the case details, and she immediately informed the court of her conversation. In these circumstances, there's no basis for us to find the trial court judge abused his discretion when he failed to call the second juror in for questioning on his own motion.

Fernandez argues the second juror may have been "lying about the conversation, and evidently seeking to have no. 6 excused" which he says would be "improper disruption." This is rank speculation. Juror No. 6 acknowledged she had trouble hearing, at first denied making the other comments, but then claimed she didn't remember what else she said. The trial judge noted her position, and though he didn't say whether he found her credible or not, apparently did not find in her ambiguous denial a basis for questioning the motives of the second juror. On this record, we can't find the trial judge abused his discretion in declining to interview the second juror.

I.  *Natural and Probable Consequences Instruction*

Martinez argues the trial judge erred by instructing the jury on the natural and probable consequences theory of guilt. Relying on *People v. Chiu* (2014) 59 Cal.4th 155

(*Chiu*), where the California Supreme Court held an aider and abettor cannot be convicted of first degree premeditated murder under the natural and probable consequences doctrine (*Id.* at pp. 165-166.), he argues we should extend that holding to coconspirators. In other words, he argues *Chiu* supports a rule prohibiting coconspirators from being convicted of first degree murder under a natural and probable consequences doctrine. We conclude the extension of *Chiu* is unwarranted where the aim of the conspiracy is lying-in-wait murder as the jury found occurred here.

*Chiu* distinguished between second degree murder and first degree premeditated murder and held that the lesser "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Chiu*, *supra*, 59 Cal.4th at p. 166.) The court looked, in part, at the correlation between the defendant's culpability and the punishment imposed. "A primary rationale for punishing such aiders and abettors—to deter them from aiding or encouraging the commission of offenses—is served by holding them culpable for the perpetrator's commission of the nontarget offense of second degree murder. [Citation.] It is also consistent with reasonable concepts of culpability. Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it." (*Chiu*, at p. 165.)

51

But, with respect to first degree premeditated murder, the Supreme Court held the same calculus did not apply. "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.] Additionally, whether a direct perpetrator commits a nontarget offense of murder with or without premeditation and deliberation has no effect on the resultant harm. The victim has been killed regardless of the perpetrator's premeditative mental state. Although we have stated that an aider and abettor's 'punishment need not be finely calibrated to the criminal's mens rea' [citation], the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved and the above stated public policy concern of deterrence." (*Chiu*, *supra*, 59 Cal.4th at p. 166.)

Martinez's argument is that *Chiu*'s reasoning should be extended beyond first degree premeditated murder to the first degree lying-in-wait murder. We don't think the extension is warranted. As the Fourth District, Division One held, "First degree premeditated murder is characterized by the 'uniquely subjective and personal' mental

52

state harbored by the perpetrator. [Citation.] First degree lying-in-wait murder, by contrast, is characterized by the objective facts of the killing itself, i.e., the manner in which the perpetrator carried out the murder. As noted, the jury here was instructed that first degree lying-in-wait murder consists of the following elements: (1) the perpetrator concealed his purpose from the person killed; (2) the perpetrator waited and watched for an opportunity to act; and (3) from a position of advantage, he intended to and did make a surprise attack on the person killed. [Citations.] [¶] These elements distinguish lying-in-wait murder from other murders, both morally and legally. Murder committed by lying in wait has been 'anciently regarded . . . as a particularly heinous and repugnant crime.' [Citation.] The moral culpability of the offender who murders by lying in wait justifies fixing the murder in the first degree. . . . [¶] [Thus], unlike ordinary premeditated murder, a lying-in-wait murder, committed with intent to kill, justifies the most severe punishment of death." (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 768 (*Gastelum*).)

We agree with our sister court that "[b]ecause lying-in-wait murder requires proof of certain conduct, rather than a 'uniquely subjective and personal' mental state, the reasoning of *Chiu* is inapplicable. [Citation.] The disconnect identified in *Chiu* between the perpetrator's mental state and the aider and abettor's culpability is not present. [Citation.] A lying-in-wait murder is murder of the first degree based on the objective facts of the perpetrator's conduct; it does not turn on the vagaries of the perpetrator's mind. It is therefore consistent with long-standing principles of the natural and probable

53

consequences doctrine to hold the aider and abettor liable for first degree lying-in-wait murder." (*Gastelum*, *supra*, 45 Cal.App.5th at p. 768.)

Given the jury's unanimous finding that Martinez participated in a lying-in-wait killing and our upholding that finding against a substantial evidence challenge, we conclude Martinez hasn't shown the trial judge erred by instructing the jury on the natural and probable consequences doctrine.

J.  *Senate Bill 1437*

1.  *Martinez*

Martinez seeks the benefit of Senate Bill 1437, which abrogated natural and probable consequences murder, second degree felony murder, and first degree felony murder for persons who were not the actual killers, did not act with an intent to kill, or were not major participants who acted with reckless disregard for life.

Initially, he asked us to conditionally reverse the judgment against him so he could petition for relief under section 1170.95. However, the Legislature has since amended that provision to permit defendants convicted under the old law to challenge their convictions on direct appeal, so long as their convictions aren't final. (Sen. Bill No. 775 (2020-2021 Reg. Sess.); Revised § 1170.95, subd. (g).) We allowed supplemental briefing on the issue and Martinez argues that, under the amended law, his murder

conviction must be reversed because the jury was wrongly instructed that he could be convicted for murder without the requisite intent.[2]

At the time of trial, section 189 provided that "'[a]ll murder . . . committed in the perpetration of, or attempt to perpetrate . . . kidnapping [or other predicate crimes] . . . is murder of the first degree." "The mental state required" at the time was "simply the specific intent to commit the *underlying felony* [citation], since only those felonies that are inherently dangerous to life or pose a significant prospect of violence are enumerated in the statute." (*People v. Cavitt* (2004) 33 Cal.4th 187, 197, italics added.) If someone perpetrated or attempted to perpetrate one of the enumerated felonies, they would be deemed guilty of first degree murder for any homicide committed in the course of committing the enumerated felony. (*Ibid.*) The trial judge instructed the jury on this law. Thus, the jury could have found Martinez guilty of first degree murder if they found he had the specific intent to kidnap the victim, even if they found he didn't have the intent to kill.

It was also possible at the time to convict Martinez of murder as an aider and abettor under the natural and probable consequences doctrine. "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a

_____

[2] Though the amendment doesn't go into effect until January 1, 2022, meaning the issue isn't technically ripe, the People ask us to rule on the issue now out of a concern for judicial economy. We agree this is the better approach. Appellants' cases cannot become final before the date the amendments become effective, so refusing to rule on the issue now serves no purpose but to delay resolution and proliferate judicial proceedings. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 973.)

natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable." (*People v. Medina*, *supra*, 46 Cal.4th at p. 920 [cleaned up].) The trial judge instructed the jury the defendants could be found guilty of murder if the killing was the natural and probable consequence of an uncharged conspiracy to commit kidnapping. Thus the jury were permitted to find Martinez guilty of murder, even if they found he intended only the kidnapping, so long as they found the murder was reasonably foreseeable. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)

The People concede the jury instructions are not consistent with current law but argue Martinez was not prejudiced because the jury's verdict establishes they found he had the required intent to kill. We agree. The jury found the lying-in-wait and kidnapping special circumstances to be true as to both Martinez and Fernandez. The trial court instructed the jury that to find the lying-in-wait special circumstance true, they must find defendants had a state of mind equivalent to premeditation and deliberation. The kidnapping special circumstance instruction also required the jury to find the defendants had the intent to kill. "The defendants are charged with the special circumstance of intentional murder while engaged in the commission of kidnapping . . . . [¶] To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant committed or attempted to commit, or aided and abetted, or was a member of a conspiracy to commit kidnapping; [¶] 2. The defendant intended to commit, or intended

56

to aid and abet the perpetrator in committing, or intended that one or more of the members of the conspiracy commit kidnapping; [¶] 3. If the defendant did not personally commit or attempt to commit kidnapping, then another perpetrator, whom the defendant was aiding and abetting or with whom the defendant conspired, personally committed or attempted to commit kidnapping, [¶] [a]nd [¶] 4. *The defendant intended that the other person be killed*. (CALCRIM No. 731, italics added.)

As we've noted, the jury found both special circumstances true as to both defendants. It follows that the jury concluded Martinez acted with the intent to kill. These findings foreclose the possibility that the jury convicted Martinez of murder, as they could have done at the time, *despite* finding he did not intend to kill the victim. Instructing the jury on those theories was harmless because we conclude beyond a reasonable doubt that the record establishes the jury based its verdicts on a legally valid theory. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 902, fn. 26.)

2. *Fernandez*

Fernandez also seeks the benefit of Senate Bill 1437 after Senate Bill 775 broadened it to apply to attempted murder. Among other changes, the amendment "[c]larifies that persons who were convicted of attempted murder under . . . the natural and probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories[.]" (Sen. Bill No. 775 (2020-2021 Reg. Sess.) § 1(a).)

57

The problem with Fernandez's argument is the trial judge didn't instruct the jury that it could find him guilty of attempted murder under the natural and probable consequences doctrine; he instructed the jury that they could find him guilty of murder or kidnapping under such a theory. The key instruction is CALCRIM 417, which addresses a defendant's liability for the acts of coconspirators. "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act *is a natural and probable consequence* of the common plan or design of the conspiracy." The jury in this case was instructed that "[t]o prove that the defendant is guilty of the crimes charged in Counts 1 and 2, the People must prove that: [¶] 1. The defendant conspired to commit one of the following crimes: murder, attempted murder, and/or kidnapping; [¶] 2. A member of the conspiracy committed murder, attempted murder and/or kidnapping to further the conspiracy; [¶] And [¶] 3. The murder, attempted murder, and/or kidnapping was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit." Count 1 was the murder charge and count 2 was the kidnapping charge. The instruction plainly excluded count 3, the charge for attempted murder.

It's true that the trial judge initially included count 3 in the oral instruction, but Martinez's counsel alerted the judge to the error and the judge cleaned up the instruction immediately. "[Counsel] just pointed out to the Court that one of the instructions I just

58

gave to you has an error in it. [¶] Now, you recall in CALCRIM 416 the evidence of the uncharged conspiracy, I read to you the People contend that the defendants conspired to commit one of the following crimes: Murder, as charged in Count 1, kidnapping, as charged in Count 2. And then the next crime – I mean, the next CALCRIM is No. 1417. And in that, I read to you this language: To prove that the defendant is guilty of the crimes charged in Counts 1, 2, and 3, the People must prove that – well, the error that we made is *Count 3 should not be included*. So to prove the defendants guilty of the crimes charged, *it would be in Counts 1 and 2, not Count 3*; okay?" (Italics added.)

It follows that the jury was not given the choice of convicting Fernandez of attempted murder under the natural and probable consequences doctrine. And as we've noted in part II.E. *ante*, the jury was instructed on direct aiding and abetting principles, which is not affected by Senate Bill No. 775, and substantial evidence supports a conviction on that basis. We conclude the jury was not presented with a theory of liability for attempted murder that could be deemed potentially erroneous when the modification of section 1170.95 becomes effective. (See *People v. Daniel* (2020) 57 Cal.App.5th 666, 677, review granted Feb. 24, 2021, S266336 [holding petitions for resentencing may be denied if the jury instructions show the jury was not instructed on either the natural and probable consequences or felony murder doctrines].) Thus, Fernandez is not a person convicted of attempted murder under the natural and probable consequences doctrine and he is ineligible for relief under Senate Bill 775.

K. *Attempted Murder as a Lesser-Included Offense on Count 1*

Martinez argues the trial court erred by declining his request to instruct the jury on attempted murder as a lesser-included offense to the murder of Lopez.

Martinez's counsel argued at trial that jurors could find Martinez guilty of attempting to murder Lopez if they believed that Martinez shot at Lopez, but someone else killed him. Counsel said, "juries do strange things and believe certain things and come to conclusions in almost every case that I've done that are contrary to what the law may necessarily require." The trial judge responded by pointing out the prosecution had presented three theories of liability—felony murder, aider and abettor, and conspiracy—and attempted murder would not be a lesser-included offense. The court refused to offer the instruction.

Even assuming attempted murder is a lesser-included offense of murder, the trial court had no duty to instruct on that crime. A trial court has a "duty to instruct on a lesser-included offense . . . if there is substantial evidence the defendant is guilty of the lesser offense, but not the charged offense." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) "In this context substantial evidence means evidence which is sufficient to deserve consideration by the jury and from which a jury composed of reasonable persons could conclude the particular facts underlying the instruction existed." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 78.) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Breverman*, at p. 177.) A trial judge is not required to instruct on theories "unsupported by any evidence

60

upon which a reasonable jury could rely." (*People v. Moye* (2009) 47 Cal.4th 537, 555.) We exercise independent review of the trial judge's decision not to instruct on attempted murder. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

Here, there was no substantial evidence Martinez merely tried to kill Lopez during the initial shooting and that someone else shot him later. Rather, the evidence showed appellants planned the killing in advance, lured Lopez to them, conducted a coordinated pursuit of Lopez and participated in a shoot-out before kidnapping him in Martinez's Jeep. More, Lopez's blood was found in the Jeep and Lopez's decomposed body was found a few days later. The notion that someone other than appellants killed Lopez is fantastical. Accordingly, there was insubstantial evidence that the offense was less than the charged crime of murder.

L. *Suppression of Martinez's Statement*

Martinez argues the trial judge should have granted his motion to suppress his statements to law enforcement, later played for the jury, because they were obtained in violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

1. *Additional background*

Before trial, Martinez moved to suppress his statements to law enforcement. He argued his waiver wasn't knowing and voluntary because Spanish is his primary language, and he didn't understand his rights, and also because he never actually gave the officers permission to interview him.

The prosecutor argued Martinez did in fact appear to understand his rights at the only interview he challenged—his first interview on August 13, 2013. On that occasion, Martinez asked only one clarifying question and twice gave the investigators permission to speak with him. They point out the interview was over an hour long, was conducted in English, and that Martinez was able to understand and answer every question asked of him.

The trial judge reviewed the video clips submitted by the defense. Martinez argued the officers tried at least five times to get a waiver, but each time his conduct suggested he didn't understand what was being asked of him. He argued that even when he said, "I want to talk to you," it was not clear he knew what he was talking about. He emphasized he kept telling the officers he didn't know why he was at the station, or what he did wrong. The officers responded, "I can't talk to you. I need your permission to talk to you first," suggesting they didn't have permission. Martinez then started talking about pressures on his family. He never affirmatively said he wanted to talk to them. He argued the interview was inadmissible because the officers never obtained Martinez's explicit permission. The prosecutor responded by noting Martinez said he understood his rights, asked clarifying questions, and then said, "I want to talk to you. I want to be honest."

The judge concluded Martinez did understand his rights, as he indicated to the officer. Further, although the officers never obtained an explicit waiver of the rights, he concluded a waiver was implicit in his response. The judge held Martinez's statement that, "Okay, but I want to talk to you guys. I want to be honest to you," was a direct

62

statement indicating he wanted to talk and had waived his rights. The trial judge denied the motion to suppress and allowed the jury to hear Martinez's statement.

### 2. *Knowing and intelligent waiver*

In *Miranda*, the United States Supreme Court held that before law enforcement officials may interrogate a suspect who is in custody, they must clearly inform the suspect of certain basic rights—"that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda*, *supra*, 384 U.S. at p. 444.) Unless the suspect waives those rights, interrogation must cease. (*Id*. at pp. 445, 475-476.)

When challenged, the prosecution must prove, by a preponderance of the evidence, that a defendant waived their *Miranda* rights. (*People v. Williams* (2010) 49 Cal.4th 405, 425.) Although a presumption exists against finding a waiver, "ultimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation." (*People v. Cruz* (2008) 44 Cal.4th 636, 668.) A Miranda waiver may be express or implied. (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218-219.) "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 (*Thompkins*).)

We accept the trial court's resolution of disputed facts and inferences, as well as its evaluations of the credibility of witnesses, as long as they are supported by substantial

evidence. We determine independently whether those facts show that the challenged statement was obtained unlawfully. (*People v. Williams*, *supra*, 49 Cal.4th at p. 425.)

Here, after engaging Martinez in some small talk, the investigator advised him of his *Miranda* rights. Martinez said he understood, then said he could not afford a lawyer. He questioned why he would need a lawyer to talk. The investigator told him he could choose whether or not to talk and reminded him he was the one who asked for the interview. Martinez then said, "I'm gonna talk to you." Martinez also said he was worried about retaliation and the investigator assured him his family was fine. Martinez then said, "Okay, but I wanna talk to you guys but I wanna be honest to you." Despite his promises of honesty, Martinez repeatedly changed his story throughout the interview and never completely told the truth, showing that he felt comfortable and was able to hold his own.

Martinez refers to the arguments made in the trial court as support for challenging the trial judge's decision. He concedes he acknowledged understanding his rights but argues there is a fuller context, namely "when the officer immediately asked him if we wanted to talk, Martinez asked if the officer could read his rights again." When the officer did so, Martinez asked, "So I don't know how to buy a lawyer . . . . or hire or do something like that. Why I need a lawyer right now to talk?" The officers then repeated their query whether he wanted to talk and understood his rights, but Martinez never

acknowledged he understood. According to Martinez, this shows he never waived his rights and, even if he did, the waiver was not knowing and voluntary.

We conclude the trial court's determination that Martinez understood his rights and waived them was well supported. Martinez didn't struggle to answer questions about his identity, employment, and health. He said affirmatively that he understood his right to an attorney, asked why he would need an attorney to talk, and said he had decided to talk. He also expressed that his primary concern was for his family. He then had a long, coherent conversation with the investigators. The fact that a defendant has some difficulty with English does not render a waiver of Miranda rights invalid. (*United States v. Bernard S.* (9th Cir. 1986) 795 F.2d 749, 752 ["Despite the language difficulties encountered by appellant, the evidence seems to indicate that he understood his rights and voluntarily, knowingly, and intelligently waived them"].) We conclude the trial judge was warranted in concluding that, though Martinez has limited skills in English, the totality of the circumstances show he knowingly, intelligently, and voluntarily waived his Miranda rights.

Nor do we conclude Martinez in fact requested a lawyer by remarking "So I don't know how to buy a lawyer . . . . or hire or do something like that. Why I need a lawyer right now to talk?" Rather, Martinez was informing the investigators he couldn't afford a lawyer and didn't feel he needed one to speak with them. "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation . . . or ask questions to

clarify whether the accused wants to invoke his or her *Miranda* rights." (*Thompkins*, *supra*, 560 U.S. at p. 381.) Courts have held isolated, ambiguous statements such as, "Maybe I should talk to a lawyer," and "[t]here wouldn't be [an attorney] running around here now, would there?" are not sufficiently clear invocations of the right that officers must terminate an interview. (E.g., *Davis v. United States* (1994) 512 U.S. 452, 455; *People v. Scaffidi* (1992) 11 Cal.App.4th 145, 153.) We conclude the remark did not require the trial judge to find the investigator should have stopped questioning Martinez and ask him again if he understood his rights.

M. *Cumulative Error*

Fernandez and Martinez argue the cumulative prejudicial effect of the trial court's errors require reversal.

"Under the cumulative error doctrine, the reviewing court must review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*People v. Williams* (2009) 170 Cal.App.4th 587, 646 [cleaned up].) "The litmus test for cumulative error is whether defendant received due process and a fair trial." (*People v. Mireles* (2018) 21 Cal.App.5th 237, 249 [cleaned up].)

Here, we have identified a few errors or potential errors at trial, but they were of a very limited nature, affecting only marginal issues. As we've discussed, they were harmless individually, and in our judgment, are harmless together. Appellants received a fair, if not perfect, trial. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) This trial

was fair beyond any reasonable doubt, despite a few scattered errors on peripheral issues. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1437.)

III

**ANALYSIS OF SENTENCING ISSUES**

A. *Fernandez's Abstract of Judgment*

Fernandez argues there are two errors in his abstract of judgment. He argues the abstract should be amended to show he has 1289 days of actual presentence custody credits. Second, he argues his indeterminate terms on counts 1 (murder) and 3 (attempted murder) should be deemed concurrent because the trial judge didn't specify whether they were concurrent or consecutive. The People concede both these points, and we agree.

At sentencing the trial judge said, "With regard to credit for time served, the defendant is entitled to 1289 days. Because this is a first degree murder case, he's not entitled to any credit for time served." It was a mistake to decline to award those credits. (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647.) "A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered." (*Ibid.*) Fernandez is entitled to 1289 days of presentence custody credit and on remand the trial court shall prepare an amended abstract of judgment showing the credit.

At sentencing, the trial judge sentenced Fernandez to life without possibility of parole on count 1, life with the possibility of parole after seven years on count 3, and a consecutive term of eight years on count 2, but didn't specify whether the sentences on

67

counts 1 and 3 would be consecutive or concurrent. "So that's the defendant's aggregate sentence in this matter. It is a determinate sentence of eight years and an indeterminate sentence of seven years to life without the possibility of parole on Count[s] 1 and 3. So then that would be the aggregate sentence."

The judge's failure to specify whether the sentences would run consecutively requires that they run concurrently. "Upon the failure of the court to determine how the terms of imprisonment on the second or subsequent judgment shall run, the term of imprisonment on the second or subsequent judgment shall run concurrently." (§ 669, subd. (b).) We therefore order that Fernandez's abstract of judgment be amended to show the sentences are to be served concurrently. (*People v. Caudillo* (1980) 101 Cal.App.3d 122, 126-127.)

B. *Ability to Pay Hearing for Fernandez*

Fernandez argues he is entitled to a hearing on his ability to pay certain fees and fines levied against him under *People v. Dueñas* (2019) 30 Cal.App.5th 1157. Specifically, he objects to the trial court's imposition of a $5,000 restitution fine, a $90 criminal conviction assessment under Government Code section 70373, and a $120 court operations fee under Penal Code section 1465.8.

Fernandez already had a hearing on his ability to pay the restitution fine. The probation officer recommended Fernandez pay the $10,000 maximum restitution fine and a $90 criminal conviction assessment based on his conviction on three counts. His counsel asked the court to set the restitution fine at zero or some low amount because his

wife was destitute and the family had no income. The trial judge agreed to reduce the restitution fine. "With regard to the restitution fine, at the request of [Fernandez's counsel] I'm going to reduce that to $5,000, so that would be the restitution fine." However, the court ordered him to pay the $90 criminal conviction assessments and a $120 court operations fee.

In *Dueñas*, the Court of Appeal held "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair; imposing those assessments upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1168.) The court also concluded the restitution statute (section 1202.4) violates due process by prohibiting a trial judge from considering a defendant's ability to pay when imposing the minimum restitution fine of $300. (*Dueñas*, at p. 1171.)

Fernandez is not entitled to relief under *Dueñas*. The trial court already considered his ability to pay the fine and assessments against him. Even before *Dueñas* was decided, the restitution statute allowed trial judges to consider an offender's ability to pay restitution above the $300 minimum award. Fernandez's counsel took advantage of that provision and explained Fernandez's financial circumstances to the court. Though the court could have reduced the restitution fine to as low as $300, he chose to reduce the fine to $5,000 and to impose the additional $210 in assessments, despite his financial

circumstances. Further proceedings "under the subsequent due process analysis in Duenas" are not required because the trial judge already determined Fernandez was able to pay $5,210 in fines and fees.

C. *Resentencing for Kidnapping*

Fernandez and Martinez argue the trial court erred by not staying their sentences on their kidnapping counts under section 654, because the kidnapping special circumstance already elevated their sentences for murder to life without possibility of parole for the exact same acts. Martinez also argues the trial judge misunderstood his sentencing discretion and that remand is required for that reason. The People concede the second point but contest the first.

1. *Staying the kidnapping sentences under section 654*

Fernandez argues the trial judge erred by failing to stay the sentence on his kidnapping count because "the jury found the special circumstance of kidnapping felony murder to be true, that is, that the murder of Lopez was committed while Fernandez was engaged in the commission of kidnapping Lopez . . . [and] [t]hat kidnapping of Lopez was the same conduct against the same victim charged in count 2 for kidnapping, for which the jury found Fernandez guilty."

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one

70

provision." (§ 654, sub. (a).) The purpose is to ensure punishment is commensurate with culpability. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.)

Fernandez relies on that statutory language and *People v. Montes* (2014) 58 Cal.4th 809 to argue the kidnapping sentence must be stayed. The defendant in *Montes* was convicted of felony murder, kidnapping during a carjacking, and carjacking, with true findings on the special circumstances of murder in the commission of robbery, kidnapping, and carjacking. (*Id.* at p. 819.) The trial judge "sentenced defendant to concurrent terms on all four counts, including count II (kidnap during a carjacking) and count III (carjacking), the predicate felonies for the finding of first degree murder on a theory of felony murder." The California Supreme Court held "section 654 precludes imposition of separate terms for [underlying] felonies, [which] are the predicate felonies for the theory of felony murder" because "felony murder was the sole theory of murder under which the case was prosecuted." (*Id.* at p. 898.)

This case is different. Felony murder was not the only theory on which Fernandez and Martinez were prosecuted and convicted. In addition, the jury were instructed on murder by means of lying in wait, murder by means of shooting from an occupied motor vehicle, and first degree premeditated murder. Further, on the special circumstances, the court instructed the jury on a lying-in-wait special circumstance in addition to the kidnapping special circumstance. Most important, the special circumstance findings establish the jury found Fernandez and Martinez to have committed the lying-in-wait offense *and* the kidnapping offense. Thus, the trial judge was free to impose the murder

71

sentence on one theory (lying-in-wait or premeditated murder) and the special circumstance on the other (kidnapping). We therefore conclude section 654 does not come into play and provides no basis for staying the sentences for kidnapping.

2. *Sentencing discretion*

Martinez argues the trial judge declined to apply section 654 to the kidnapping count based on an incorrect belief that the murder count and the kidnapping count involved separate victims, when in fact Lopez was the victim of both offenses.

Martinez is correct that the trial judge concluded section 654 didn't apply "because there is a different victim in Count 2 [kidnapping] than Count 1 [murder]." The People properly concede the trial court made a factual error which requires correction.

"Relief from a trial court's misunderstanding of its sentencing discretion is available on direct appeal when such misapprehension is affirmatively demonstrated by the record." (*People v. Leon* (2016) 243 Cal.App.4th 1003, 1026.) When it is unclear how the judge would have otherwise exercised its discretion, we may order a limited remand of the matter so that the judge may properly exercise its discretion and again decide whether or not to stay the sentence on count 2. (*Ibid.*)

D. *Corrections on Martinez's Abstracts of Judgment*

Martinez identifies several problems with his abstracts of judgment. First, he argues—as Fernandez did—that his indeterminate terms on counts 1 (murder) and 3 (attempted murder) should be deemed concurrent. The People concede, and we agree.

72

During Martinez's sentencing, the court said, "So then, the defendant's sentence, I break down as follows: The total period [of] incarceration is a determinate term of 48 years and an indeterminate term of life without the possibility of parole. Now, I also would order, pursuant to Penal Code section 669, that the defendant serve the determinate term before he undertakes [serving] the indeterminate term. So, then, in summary, this is the indeterminate sentence of life in prison without the possibility of parole, along with a determinate term of 48 years in state prison." As in Fernandez's case, the judge's failure to specify whether the sentences would run consecutively requires that they run concurrently, and we order that Martinez's abstract of judgment be amended to show the sentences are to be served concurrently. (§ 669, subd. (b); *People v. Caudillo*, *supra*, 101 Cal.App.3d at pp. 126-127.)

Second, he argues the trial judge improperly concluded he had no right to any credits due to the nature of his conviction. Though Martinez had no right to conduct credits, he did have a right to custody credits. (*People v. Taylor*, *supra*, 119 Cal.App.4th at p. 647.) He was arrested on August 14, 2013 and sentenced on June 19, 2019 for a total pre-sentence custodial period of 2,136 days. He has a right to the award of those credits and on remand the trial court shall prepare an amended abstract of judgment showing the credit.

Third, Martinez identifies two clerical errors in his abstract of judgment. He says the section 12022.53, subdivision (c) enhancement attached should be included on the CR-292 abstract which records the judgment on count 3, not the CR-290 determinate

term abstract which records the judgment on count 2. He also says an attachment to the abstract indicates he is subject to a $514.58 booking fee, when the trial court determined "he does not have to pay the fines and fees until such time as it is determined that he has the financial ability to do so." The People concede these clerical errors and that it is appropriate for this court to correct them. We agree. (*People v. Mitchell* (2001) 26 Cal.4th 181, 187-188 ["[W]here, as here, the Attorney General identifies an evident discrepancy between the abstract of judgment and the judgment that the reporter's transcript and the trial court's minute order reflect, the appellate court itself should order the trial court to correct the abstract of judgment"].)

# IV

# DISPOSITION

We reverse Martinez's sentence on count 2 and remand to the trial court to exercise its discretion on whether to stay that sentence, understanding the offense had the same victim as the offense in count 1. In addition, we direct the trial court to modify Martinez's abstract of judgment by (i) striking the $514.58 booking fee, (ii) adding the section 12022.53, subdivision (c) enhancement to count 3, (iii) removing the enhancement on count 2, (iv) recording that he has 2136 days of actual presentence time served, and (v) recording that his sentences on counts 1 and 3 are to be served concurrently, and to forward the modified abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects we affirm the judgment against Martinez.

In Fernandez's case, we direct the trial court to modify Fernandez's abstract of judgment to show he has 1289 days of actual presentence time served and his sentences on counts 1 and 3 are to be served concurrently, and to forward the modified abstract of judgment to the Department of Corrections and Rehabilitation. We affirm the judgment against Fernandez as so modified.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


SLOUGH_____
J.


We concur:


MILLER_____
        Acting P. J.


RAPHAEL_____
        J.